Nott, J.,
dissenting:
Tbis is the first case decided by this court under the “Abandoned or captured property act,” since an appeal to the Supreme Court in such cases has been given by Act 25th June, 1868, (15 Stat. L., c. 71.) When the “Abandoned or captured property act” was first before us in conference, my views went somewhat further than those announced by the court in Margaret Bond’s Case, but inasmuch as no appeal then lay from the decision of this court, and inasmuch as I agreed with the general principles stated in Margaret Bond’s Case, so far as they went, I thought it best not to encumber the record with useless opinions, but to aid my brethren in giving effect to the law as they construed it. The right of appeal now being extended to this class of cases, I shall state briefly the precise construction I gave and still give to the statute.
The “Abandoned or captured property act” is not a contract, but is a compact. Its violation through subsequent legislation will not involve the defendants in damages, other than that dishonor which attaches to governments that do not keep faith with those to whom' they proffer promises. Subsequent statutes may therefore change the terms upon which claimants may recover the proceeds of their own property; but such a construction cannot be placed upon an act of Congress, unless its words are so plain and unequivocal as to leave to the court no other alternative.
By this compact Congress said to their loyal adherents within the insurrectionary States, “Remain faithful in your allegiance to the United States to the end of the struggle; give neither aid nor comfort to our common enemy; and if our armies by an evil chance capture your property, it shall be restored. The government cannot retain all captured property to restore it in that form j therefore it shall be sold, and the net proceeds paid to you instead. The government cannot now in the midst of war inquire into your loyalty or your ownership; therefore within a reasonable period after the war has ended this shall be done. A tribunal of our own creating shall be the umpire, and when it establishes the fact of your loyalty, whatever the government possesses of yours shall be restored to you again.”
That the captured or abandoned property fund is a trust is a fact vital to an understanding of that statute. On the one *30 band, the error which has crept within the last year into the public press, and even into the halls of Congress, that this court is being overwhelmed with cotton cases, and that its judgments in such cases may embarrass the Treasury, can have no existence in fact,* for these suits are but equitable proceedings against this fund, and if the suits are of great number, so must be the several parcels of net proceeds. There can be no more judgments than there are parcels of cotton, or its proceeds, in the Treasury; and if the court had rendered judgment for the claimants in every case, they could take nothing out of the Treasury which was not already in this trust fund. On the other hand, a claimant under this act cannot set up the value of the property captured, as some have sought to do; nor content himself with showing that the proceeds “ought to be in the Treasury,” as in several instances has been attempted ; nor recover damages of the government for the loss of his property by the negligence of the public officers, or the culpable frauds and malpractices of some of the defendant’s agents. All that he can do is to say and to show that the defendants now hold in trust for him, one of their loyal citizens, a certain fund, which is the proceeds, or a part of the proceeds, of specific property, of which they voluntarily assumed the control and the guardianship. Whether the property brought little or much, whether the proceeds were wickedly squandered or faithfully kept, whether the capture was unlawful and the proceedings irregular, are questions foreign to the suit; it is simply a proceeding in equity to recover a specific thing, and that specific thing is the fund now actually remaining in the Treasury.
And from these two conclusions may be drawn a third, which is that this court is powerless to give greater or other relief. It has no authority to make the government pay for the frauds done by its agents; and it is specially restrained by statute from entertaining jurisdiction of cases growing out of the “appropriation” of property by the army or navy; (Act 4í7¿ Jtily, 1864, 13 Stat. L., p. 381.) If it were to give a claimant a decree for more than he has in the Treasury, the decree would be void to that extent for want of jurisdiction. The Secretary of the Treasury could not pay out money which he did not have in the Treasury, neither could he satisfy the decree of one claimant with funds which might belong to another; nor could he pay away upon the decree money which had been appropriated by *31 Congress to tbe payment of tbe nation’s debts. I am aware tbat tbe fund bas been “covered into tbe Treasury” by tbe act of Congress, but tbat is only a form of law to prevent its illegal surrender or misapplication ; tbe great fundamental distinction between it and tbe “appropriations” of Congress remains — tbat it was not raised by taxation nor acquired from tbe public property of tbe nation, and tbat, as against loyal otoners, tbe United States bave never confiscated it, nor owned it, nor claimed to own it, save as trustee for those to wbom it might equitably belong. ■
But as against parties guilty of disloyal acts, tbe defendants acquired a legal title by lawful capture. There tbe equitable title to tbe proceeds follows tbe legal title in tbe property; there tbe government is both trustee and owner, and possesses a joint or several interest, as tbe case may be, in tbe general fund.
Basing my construction of tbe statute on these general principles, I think this court bas erred in several matters:
I. First, tbe time within which a suit may be brought is prescribed by the statute to be “ within two years after the suppression of the rebellionand within two years; as was pithily said by Judge Boring in Tibbitt’s Case, (1 C. Cls. R., p. 169,) “cannot be before or after them.” And such must bave been tbe intent of Congress, apart from tbe plain import of their words; for this court could not exercise its jurisdiction -within tbe enemy’s lines, nor could tbe government find witnesses for tbe defence, nor could a contestant claimant appear and be beard. Neither did Congress limit tbe condition of loyalty to a part of tbe rebellion. It was not sufficient for a claimant to say tbat be bad not given aid or comfort for the part of tbe rebellion past when bis suit began; be must show “ after the suppression of the rebellion,” tbat “he has never given any aid and comfort” to it. The point, therefore, to be determined, is not when the time ended, as is said by tbe majority of tbe court, but when tbe time began. To say tbat a claimant might maintain bis action at any time after tbe act was approved, is to say that before the rebellion was half over a claimant and bis witnesses might straggle in through the military lines, might obtain a decree and receive bis net proceeds, and then might straggle back again to spend the money thus acquired in tbe service of the late Confederate States.
Tbe initial point at which an action under tbe “ Aba/ndoned *32 or captured property act” can be brought, must be that point of time in the “ suppression of the rebellion ” at which the executive department of the government recognizes the restoration of civil authority and the active jurisdiction of the Federal courts. The rebellion has never been recognized as existing throughout all the territory of the United States. A broad distinction has always been made by Congress between the inhabitants of the loyal and the inhabitants of the insurrectionary States. The President was authorized to recognize these as they existed,
(.Act 13th July, 1861, 12 Stat. L., p. 255;) expressly authorized to declare the liabilities begun, and impliedly to declare them ended. As a matter of fact the rebellion began in different States at different times; as a matter of fact it ended in different States at different times; as a matter of law it has been treated by Congress as existing by States and parts of States. Neither in fact nor law did it exist as an entirety, either as regards territory or as regards time. Therefore I think there is no authority for holding, when the same power which lawfully declared Georgia in a state of insurrection lawfully declared the rebellion in Georgia suppressed, that it was not suppressed, and that its inhabitants were to remain under the same disabilities as the inhabitants of States still in rebellion. Still less do I think that there is authority for holding that the rebellion maintained in a remote corner of Texas, or in the Indian territories, should bar an action accruing to a citizen in a State which might have returned to her allegiance, and been restored to all her former rights.
The time at which the rebellion in the State of Georgia must be deemed suppressed, is fixed by the Proclamation June 17, 1865, (13 Stat. L., p. 764,) and this for three reasons:
1. Because the proclamation expressly declares that it has become “necessary and proper to carry out and enforce the obligations of the United States to the people of Georgia in securing them the enjoyment of a republican form of government,” and provides for the re-establishment of a civil government.
2. Because the proclamation, by general directions to the different Secretaries, puts “in force all laws of the United States” and re-establishes post offices, custom-houses, and all the offices of the civil government of the United States; and not only this, but it expressly re-establishes the courts of the United States by directions to the district judge uto hold cowts within *33 said State,” and to the Attorney General to “ enforce the administration of justice within said State in all matters within the cognisance and jurisdiction of the Federal coiirts.”
3. Because this proclamation is the first act of the executive or legislative department's which declares the rebellion suppressed, and when that suppression is once declared, and the time thereby fixed wherein a claimant can bring his action, it cannot be undone by subsequent executive proclamations or legislative recognitions. A court in these circumstances has not a number of proclamations to choose from, but must recog-. nize and be bound by the first. If this court had been required to pass upon the question the morning after the proclamation of June 17,1865, or April 2,1866, (14 Stat. L., p. 811,) or if no subsequent proclamation had ever been made by the President, then no man would ever have doubted that one or the other of these proclamations fixed the suppression of the rebellion in the State of Georgia.
Of the objections urged against this proclamation as fixing the time of the suppression of the rebellion within the meaning of the “Abandoned or captured praperty act” there are but two which need be considered. The first is what is termed the recognition by Congress in the Act 2d March, 1867, (14 Stat. L., p. 422,) and of this several things may be said. In the first place, Congress never meant by that act to declare any general recognition of the time fixed by the proclamation of August 20,1866, but having before them the subject of continuing the war-pay of the army for a limited time, named that proclamation instead of arbitrarily naming a day. A liberal intent toward the army, and a desire to express the theory of the act in the act, sufficiently explain why the last proclamation was named. In the second place, the rebellion may be deemed suppressed in one sense and not in another. Its completion was not the work of any particular moment. In some senses it is not suppressed yet. Its suppression so far as the army establishment was concerned, was a very different thing from its suppression so far as any other branch of the government was concerned. Within the meaning of this statute, it was undoubtedly suppressed when the Federal courts were restored to the active exercise of their jurisdiction. And in the' third place, Congress could do what this court cannot do, and that is exercise a legislative discretion, *34 and cboose among tbe various proclamations that one which, best suited their legislative purposes.
The second objection suggested is that it will be difficult to decide whether the limitation will run from the time the rebellion was suppressed in the State where the property was captured, or in the State where the claimant resides. The objection is groundless; for a statute of limitations does not depend upon the' residence of the plaintiff, but takes effect, in the case of realty, where the cause of action arises, or in most other actions, on the opportunity which the defendant’s residence has given to the plaintiff to sue. Here the act would take effect from the time the disability to sue ceased in the State where the cause of action arose. If the claimant were in another insurrectionary State, he, like a claimant in a foreign country, would have two years wherein to return and bring his action. I presume that under the rule now adopted, absence from the United States will not give rise to any serious question as to the effect of the statute. A claimant would indeed have to prove his loyalty through the rebellion, wherever he might have been, but that is a different matter, and does not affect his right to bring the action.
In this construction I am confirmed by the action of the bench and bar in these cases: The decision in TibbeWs Case, (1 C. Cls. R.., p. 169,) that a suit would not be brought until after the suppression of the rebellion, though made by a minority of the court, has never been questioned until the decision in this case, and no more suits were in fact commenced until after the rebellion was supposed to be suppressed. Yet a large number of suits were brought after the proclamation of the 17th June, 1865, and before the proclamation of August 20,1866; and if the construction now given to the statute by the majority of the court is correct, then the leading case of Margaret Bond was brought before the rebellion was suppressed.
But though we pass the proclamation of 17th June, 1865, there still remains that of 2d April, 1866, (14 Stat. L., p. 811.) It declares “that the insurrection which heretofore existed in the States of Geoi’gia, South Carolina,” and eight others, “ is at an end, and is henceforth to be so regarded.” The question of its construction is not involved in this case, for here the petition was filed on the 22d June, 1867, but it renders certain the fact that the insurrection was wholly suppressed in the State of Georgia before the proclamation of August 20,1866. The like *35 proclamation bad already been made as to the State of Tennessee, (Proclamation 13th June, 1866, 13 Stat. L., p. 763,) so that on the 2d April, 1866, but one State had not been thus officially recognized. Whether the doubtful State of Texas could thus defeat the suits of loyal citizens in all the others is the precise question here involved.
II. My second ground of dissent is that I think the “Abandoned or captured property act” should not be so construed as to impair the effect of the previous statute of 17th July 1862, (12 Stat. L., p. 589, § 6,) which declares “ all sales, transfers, and conveyances” of persons engagedin the rebellion “null and void;” and hence that when a claimant acquired the captured property “ after the expiration of the sixty days” given by that statute, thatis to say “from the date of the warning and proclamation” ofthe President of July 25th, 1862, (12 Stat.’L., p. 1266,) he must be required to prove a loyal title.
It would indeed be hard to require of persons shut in within the insurrectionary district a knowledge of a statute published only on this side of the military lines, were it not that this statute is only the enforcement of a citizen’s natural duty. Every man knows that it is his duty to abstain from aiding or trafficking with those engaged in overthrowing the government to which he owes allegiance; and every claimant knew that when he bought cotton from those thus engaged, he at least bought property which had been liable to capture. The statute therefore merely compels the court to enforce a duty; and here, as in all other cases, if a party did wrong in ignorance of law, his ignorance does not excuse him. So thought Congress when they enacted the law and provided that it be made known by the “warning and proclamation” of the President, and so thought the President when he issued that “warning and proclamation,” and I know of no sufficient reason why a court should suspend the operation of this act of Congress.
III. Finally, I think the form of the decree is wrong, and that by it the court has transcended its powers as regards both claimants and defendants.
In the leading case under this statute this court has said, (Margaret Bond’s Case, 2 C. Cls. R., p. 532:) “We are to decide three things: first, that the claimant was the owner of the property seized and sold; second, that he is entitled to the proceeds; third, that he has never given any aid or comfort to the recent *36 rebellion. If be prove ,these things, the law says, expressly, lhe shall receive the residue of such proceedsafter the deduction of the lawful expenses attending its disposition and sale.” Now, in practical effect, we depart from this construction of the act by making the claimant prove a fourth thing, viz: the precise balance remaining in the Treasury, or, in other words, the amount of the expenses. There is and can be no propriety in this court finding, for the edification of the Secretary of the Treasury, how much money he has spent, nor how much of the proceeds he has remaining. All that the court can do is to direct him to pay over the net proceeds: all that the Secretary can do is to pay them. If the decree is too large he cannot satisfy it, for he has nothing to satisfy it with; if the decree is too small the claimant is wronged, and a part of the fund remains undisposed of. As a matter of practice the present course is an empty form, for the Secretary makes up the account and certifies it to the court and the court adopts it and certifies it back to the Secretary. Furthermore, the practice pursued has done more to confuse the public mind and to mislead parties to their prejudice than any other point connected with these cases. If the substance of these decrees were truly preserved in their form, it would be clearly seen that they are not money judgments for the debts of the nation, but simply decrees in equity for the specific return to its owners of property which does not belong to the defendants. The simplest and the wisest practice would be to adopt from chancery a form of decree analogous to that by which a master is directed to withhold the amount of his fees and expenses, and pay to the complainant the balance of a fund now in his hands; i. e., for us to render a decree fixing the number of bales of cotton captured, the place and time of capture, and directing the Secretary to pay over to the claimant the net proceeds thereof. '
Peck, J. I concur with Judge Nott that the initial point at which an action like this might have been brought, was ■within two years after the executive department had recognized the restoration of civil authority and the jurisdiction of the Federal courts.